IN THE

## *Supreme Court of Judicature*

OF THE

## STATE OF NEW-JERSEY,

AT FEBRUARY TERM, 1818.

---

### FERRIS *against* SAXTON. (a)

THIS was an action brought by *Ferris* as endorsee, against *Saxton* as endorser of two promissory notes for 4459 dollars 78 cents, each, made by one *George Holcomb*, to *Saxton*, and by him endorsed to one *Gordon*, and by *Gordon* to the plaintiff. The notes were both dated 21st *February*, 1814, and payable, the one at four, and the other at six months, at the *State-Bank* in *New-Brunswick*.

The plaintiff proved the hand-writing of the maker and endorsers of the notes, and read the same to the jury; he also proved, that the notes were presented to the cashier of the bank, on the days on which they became due, and payment demanded, which the said cashier refused; that the notes were thereupon protested in the usual form, and that on the days following, letters were put

*Promissory note—Nature, time, and necessity of notice to the endorser.*

---

(a) Cited in *Johnson vs. Martinus*, 4 Hal. 146 (disapproved in *Chaddock vs. Vanness*, 6 Vr. 517), *Bank vs. Butler*, 7 Hal. 270, *Barkalow vs. Johnson*, 1 Har. 400, *Freeman ads. Brittin*, 2 Har. 237. Partly overruled in *Hazelton Coal Co. vs. Ryerson*, Spen. 129. See, also, *State Bank vs. Ayers*, 2 Hal. 130, *Sussex Bank vs. Baldwin*, 2 Har. 487, *Burgess vs. Vreeland*, 4 Zab. 71, *Disborough vs. Vanness*, 3 Hal. 231, *Ribble vs. Jefferson*, 5 Hal. 139, *Martinis vs. Johnson*, 1 Zab. 239, *Washington Bank vs. King*, 2 Green 45, *Woodruff vs. Daggett*, Spen. 526, *Howland vs. Adrain*, 1 Vr. 41, *Haines vs. Dubois*, 1 Vr. 259, *Halsey vs. Salmon*, Pen. *916, *Oliver vs. Munday*, Pen. *982.

into the post-office at *New-Brunswick*, addressed to the
said *Saxton* and *Gordon* respectively, at *Flemington*, con-
taining notices of such demand, refusal and protest; that
the notary who sent the notice, had taken pains to make
inquiry respecting *Saxton's* residence; that he inquired
of one *Samuel Holcomb* of *New-Brunswick*, who he under-
stood came \*from the part of the country where *Saxton*
lived, and had connexions in trade there; and was in-
formed, that *Flemington* was the *most likely place* of his
receiving a notice.

*Ferris
v.
Saxton.*

Upon this the plaintiff rested his cause.

The *counsel* for the defendant then moved for a nonsuit,
for the insufficiency of this notice.

But the court observed.

1. This question of due notice on the non-payment of
notes, has not been very satisfactorily settled in *New-Jer-
sey:* the old practice, and indeed the practice up till this
day, so far as I know, has been, to consider the endorser
merely as security for the maker of the note, and if he
would exonerate himself, to put him to shew, that the
non-payment had been owing to want of due diligence
in the holder, and that if condemned, the loss would fall
upon him, for want of reasonable notice of such non-
payment.

2. Upon this principle, it has been the course of the
court to submit the question of due diligence and reason-
able notice, as a matter of fact, to the consideration of the
jury, and not as a matter of law, to the opinion of the
judges. It is well known, that different rules have been
adopted, both in *England* and in our neighbouring *States*
on this subject; but I am not willing to depart from
what I consider as a settled practice, on any authority
less than a decision at bar. I am therefore disposed to
leave this case to the jury, upon the evidence, both as to
the question of due diligence and of reasonable notice;
and I do this with a direct view, that the matter may be
stirred at bar, if it shall be found necessary, on the com-
ing in of the *Postea*, in order that this very important
doctrine may be settled in this state, upon proper prin-
ciples, and become publicly known.

3. As these notes are drawn on stamp-paper and made

payable at bank, it must have been well known to the endorser, that they were intended to be negotiated there; that the bank having a settled and well known custom as to these notices, it may be considered, that the endorser under such circumstances, submits himself to this custom, and that both he and the bank are bound by it. And if so, it will be for the jury to consider, whether this custom has been pursued in this case, and whether the notice has in all things been such as the custom required. Therefore let the motion for nonsuit be overruled.

*The defendant examined a number of witnesses; who proved, in substance, that *Saxton* used formerly to live at *Flemington*, where he kept an office as an attorney at law; that in the spring of 1814, he moved to Major *Hunt's* in *Lebanon*, where he still lives, being about 10 miles from *Flemington;* that there are several post offices nearer to Major *Hunt's* than that at *Flemington*, and some of them within 4 or 5 miles; that *Saxton* appeared to be much engaged in other business besides that of an attorney at law; that he is a single man, without a family.

*3

The defendant offered *George Holcomb* the maker of the note as a witness; who was objected to, on the ground that he was the maker of the note, and therefore interested. But the court, constrained by the decision in *Alley's* case, directed the witness to be sworn, and left his credibility, under the peculiar circumstances of the case to be weighed by the jury.

*Holcomb*, swore that he had no interest in the cause, let it be determined whichsoever way it might; that he had had negotiations and accounts with *Ferris* the plaintiff; that he made a settlement with him at *Drake's* tavern, in *New-Brunswick*, in the presence of *William R. Smiley* and one *Haines;* that on that settlement there was a balance due to Ferris of 4459 dollars 78 cents, and that he agreed to give him his note for that sum, with *Saxton* and *Gordon* as endorsers; that a note was accordingly drawn by said *Smiley*, and signed by the witness for that sum, but he thought, as it was read to him, it was not payable at bank; that after the signing of the said note, *Ferris* alleged that there had been an omission in the settlement, of certain interests due to him, and

also an error in certain freight charged by the witness, and that on account of this omission and error, there was due to him a further sum of 200 dollars or upwards; that on account of a difference between *Ferris* and himself as to the amount of the freight, they could not *then* ascertain the precise sum so due to *Ferris*, he claiming 200 dollars or upwards, and witness supposing there was due not more than 160 or 170 dollars; that witness then proposed to sign another note, in blank, and get it endorsed by the said *Saxton* and *Gordon*, to be filled up when the said balance should be ascertained, and that he did sign the same accordingly; that he sent as well the said note as the said blank, signed as aforesaid, to his clerk, *Achilles Large*, to get them endorsed by the said *Saxton* and *Gordon*, and that they were * afterwards sent back to him so endorsed; that as witness could not go at the time to *New-York*, he gave the said notes to the said *Smiley*, who undertook to settle the said account with *Ferris*, to fill up the blank note with the proper balance, and to take *Ferris*' receipt and discharge; that the whole sum which he owed *Ferris*, was about 4746 dollars; that he had an account of freight against him for the transportation of goods, of 119 dollars, or thereabouts, which, together with the said note of 4459 dollars 78 cents, being deducted, would leave a balance of 167 dollars, or thereabouts; and that with this sum, the blank note ought to have been filled, and with no more. But, the witness offered no regular books, or accounts, to establish these sums or balances, or how they arose.

*A. E. Large*, swore that when *Holcomb* sent the note at six months to him, it was in blank, and was so endorsed by *Saxton* and *Gordon*, and that the other is the note at four months, and he thought was not then payable at bank. And it was also proved that the filling up, or rather the whole note, is in the hand-writing of *Smiley*.

The plaintiff gave in evidence, the deposition of said *Smiley*, taken by commission, in substance as follows: That he was present at *Drake's* tavern, 21st *February* 1814, when a settlement took place between *Ferris* and *Holcomb*, on which *Holcomb* fell in debt to *Ferris*, 8919 dollars 56 cents, with which *Holcomb* was perfectly satisfied, &c.;

that there was no mistake, unfairness or fraud in the settlement; that at that time the defendant drew the two promissory notes, which *Holcomb* then and there signed; that *Ferris* immediately went to *New York*, leaving with deponent the two notes with the evidences of the debt due from *Holcomb* to *Ferris*, for which the notes were given, and the calculations, &c. *with* directions to deliver the evidences of said debt, to *Holcomb*, when he should procure the endorsements of *N. Saxton*, of *Gordon*, and *G. Rockefellar;* that on the same day the deponent delivered the two notes to *Holcomb* to get the endorsements; that some time after, *Holcomb* returned the two notes to deponent endorsed; that a short time afterwards, deponent delivered to *Holcomb* the evidences of debt and calculations aforesaid. That at the time of settlement, the deponent became acquainted with the consideration for which the two notes were given; that *Ferris*, at that time held and produced a * note drawn by *Holcomb*, for about 2600 dollars; two or more drafts drawn by a certain *William Haines*, on Holcomb, and by him accepted, for upwards of 3000 dollars; also a book account for a large sum of money; which *Holcomb* acknowledged to be just, and which amounted to 8919 dollars 56 cents. That the deponent had not in his possession any of the papers by which the said settlement was made—all were delivered to *Holcomb;* that the two notes were written by him before they were signed or endorsed, and that there was no blank in date, amount, or any other respect, left in said notes previous to their being signed and endorsed. That deponent understood at the time of settlement, that part of the sum due from *Holcomb* to *Ferris*, arose from certain drafts drawn by *William Haines*, on *Holcomb*, and by him accepted; that *Haines* had failed, and *Ferris*, as the holder, claimed the amount from *Holcomb*, as acceptor; that *Holcomb* admitted the claim, and it constituted part of the amount.

*George Holcomb* being again called, said that *Ferris* did not at the time of this transaction, hold any notes or drafts of said *Haines*, accepted by him; that when he found the blank had been filled up with a larger sum than agreed upon, he reproached *Smiley* with his want of

*5

fidelity, and that *Smiley* said it would make no difference, it was to oblige *Haines*, who was a clever fellow, and who would raise the money to meet it before it was due.

Sundry witnesses were called to impeach the credit of *Smiley*, and they represented him as a man unworthy of credit. It was proved that *Holcomb* had been considered as a man of large property; that upon the arrival of the *Bramble* in *January* 1814, his circumstances began to change and to decline; that he became greatly embarrassed, and that, at the time of the trial, he was thought to be insolvent.

The cause was submitted to the jury without summing, and without charge from the court, except merely to say, "that a note under the circumstances detailed by *Holcomb*, is not like one assigned for valuable consideration, without notice of such circumstances. In the hands of such an assignee, it is no matter whether the note was signed in blank or not, or whether it had been filled up according to agreement or not. But here, according to *Holcomb*, the assignee is a party to the original contract; the note is, in fact, given to him for a balance due, and the endors*ers are but sureties for the payment. This is the substance; the form does not alter the law. The fraud in filling up, was a question for the jury." The jury found a verdict for the plaintiff for 10403 dollars 66 cents, being the amount of both notes.

On the coming in of the *Postea*, a rule was taken to shew cause, why this verdict should not be set aside, and a new trial granted. This rule was argued at *November Term* last.

*Ewing*, for the defendant.

1. The *Judge*, at the circuit ought to have ordered a nonsuit, because the plaintiff had not made proof of those matters, requisite to maintain his action.

The proof required from the plaintiff, must in all cases, depend on the nature of contract on which he sues.

The contract entered into by the endorser of a promissory note, does not bind him at all events to discharge the note; it is a conditional engagement only. His lia-

bility arises on the performance by the endorsee, of the condition contained in the contract. He engages, that in case the note be not paid by the maker, he will pay, provided due diligence be used by the holder. The endorsement raises a promise in law, to pay the note, not absolutely, but, provided the holder, in due season, demand payment from the maker, and give notice of non-payment—*Kyd*, 75, 76. 9 *John.* 121.

The contract on the part of the holder, is also conditional. He engages to use due diligence; and without performance on his part, no right of action accrues.

This view of the subject evinces at once, and with certainty, the proof to be produced by the plaintiff. He must prove the endorsement and the performance of the condition on which the liability of the endorser depends. He must shew due and legal diligence. This consists in a demand of payment made on the drawer by the endorsee, on the day the note becomes payable, and a notice of non-payment from the endorsee to the endorser, to be given without delay. *Kyd*, 79. 12 *John.* 424. 4 *Dall.* 129. 10 *Mass.* 84. 2. *Caines*, 343. The usual form of declaration containing an averment of demand and notice, points out the proof expected from the plaintiff.

To require the defendant, by way of defence, to prove want of diligence and loss or damage thence resulting to him, is incon*sistent with the nature of the contract between the parties, is to invert the established order of proof, by compelling him to prove a negative in a case where the law by no means presumes the affirmative, and would leave nothing more for the plaintiff to shew, than the mere fact of endorsement, which is far short of the duty most evidently imposed on him.

Applying these doctrines, the defect of the case made out by the plaintiff is manifest. He proved a legal demand. He proved a notice put in due season into the post-office, addressed to *Flemington;* but he did not prove that this notice ever came to the hands of the defendant, or that *Flemington* was his place of residence.

It is not contended that a personal service of notice must always be shewn; a notice may be sent by post, but this can only be where the endorser lives at a post

town ; and the sending by post is but presumptive evidence of notice, liable to be counteracted by proof that it was never received. Where the party has a fixed place of residence, it must be sent there ; and want of proof of actual service can only be supplied by proof that it was sent to his place of residence, or that he had no fixed place of residence, and could not be found. 13 John. 432.

Proof of notice by mail, addressed to *Flemington*, unaccompanied by proof of the defendant's residence there, was utterly defective : it might as well have been addressed to *Trenton* or to *Salem*.

To the argument founded on the supposed customs of the bank where this note was lodged for collection, we answer :    This note is not drawn on stamp-paper ; neither the drawer or endorser of the note therefore. could have intended or antieipated a negotiation of it at bank, and cannot therefore be bound by such customs. But it is insisted that the bank could have no valid or obligatory rules or customs inconsistent with, or contrary to the law of the land. 2 *Caines*, 343.    And if it could, no proof was given on the trial of this cause, that any such custom or rule existed.    The notary stated what was *his* custom, not what was the custom of the bank.

2. This verdict ought to be set aside, because it was submitted to the jury to decide, whether the facts proved by the plaintiff constituted legal diligence ; a question which should have been decided by the court on the motion for a nonsuit.

*8         *What shall constitute due diligence is a question of law.    It is an inference of law to be drawn from the facts in any given case.    The court therefore, not the jury, should draw such inference.    Where the evidence of facts is disputed, it is proper for the jury to pass upon them, but with express instructions from the court as to the legal result of those facts which ever way they are found ; but where the facts are not controverted, as in case of motion for a nonsuit, it is the province of the court to say, what are the legal result and operation of those facts, and whether they entitle the plaintiff to recover. The effect of facts proved or admitted, is always a question for the court.    Whether notice was given ? how ? when ?

are questions for the jury. But whether the notice thus Feb., 1818.
given is in proper form and due season, are obviously
questions of law, not of fact. *Kyd*, 80, 81. 4 *Dall.* 165.
The doctrine now contended for, has been recognized by
the court. *Penn. N. J. Reports*, 916.

Ferris
*v.*
Saxton.

3. If the question of diligence is proper to be submitted to the jury; then the jury have in this case erred, and their verdict should be set aside.

The proof of diligence given by the plaintiff, was radically defective and entirely inadequate; but all reasonable pretence of diligence was dispelled by the defendant's testimony. He shewed incontrovertibly, that he had a fixed, notorious place of residence, at *Lebanon*, not at *Flemington;* and that there were several post-offices much nearer than *Flemington* to his place of abode; we deny that sending by mail is any evidence of notice, unless the party actually reside in the very town to which the letter is addressed. 10 John. 493. But if any latitude in this regard is allowed, surely the nearest post town is indispensable.

4. If the jury are the legal arbiters of the question of diligence, the case should have been put to them expressly on that point; their attention should have been peculiarly claimed upon it; they should have been directly charged to inquire and consider, and be governed thereby. There is much reason to believe the sufficiency of the notice and the exercise of diligence, never entered into their deliberations.

5. The verdict is against evidence, and erroneous. Great respect and weight are due to the decision of a jury on matter of fact; but reproachful would be our jurisprudence, and deplorable our condition if in this regard they were beyond controul.

*1. One of these notes was drawn and endorsed in blank; when issued it was expressly stipulated that it was not to be filled up at pleasure, but with a certain sum of small amount, not exceeding 200 dollars. All this was known to *Ferris*, the endorsee; he was in fact, present at, and a party to the agreement. The note was however filled up with 4459 dollars 78 cents. *Ferris*, therefore, if entitled to recover any thing, should have

*9

had a verdict only for the amount originally stipulated. These facts, it is true, mainly depend on the testimony of *Holcomb*, but he was a competent witness, *Penn. Rep.* 791; and his character was unassailed. He was in his representations contradicted by *Smiley*, by nothing else, by no other witness. *Smiley*, by a number of highly respectable witnesses, was proved infamous, and not credible, and was himself the instrument of this imposition. By what legal principle then, could the jury have been governed?

Mr. *Stockton*, in answer. This being an application for a new trial, because a nonsuit was not granted at the Circuit; it is incumbent on the adversary to shew that there was *no evidence;* for if *any* evidence, the jury ought to pass upon it.

The contract of the endorser, as stated by the counsel for the defendant, is admitted to be true. The endorsee must give evidence of a demand, or of reasonable diligence to make it: he must also give notice to the endorser, or use due diligence to do so.

But the demand need not always be personal: it may be at the bank, if the note be payable there. Here the necessary and proper demand was made.

If an endorser live in the same town, a personal notice ought to be given: and where the note is particularly located, notice at that place is sufficient.

The question of notice, is always *prima facie*, a question of fact. The dispute, whether it was for the court or jury to decide, has had reference to the *time* of giving the notice, and neither to its contents nor the truth of its being given at all. If there be any evidence before the jury, from which a notice might fairly be inferred, then all difficulty ceases. It not only becomes a question wholly for the jury; but, the evidence itself is sufficient.

The notice need not be personal; nor need it be left at the residence of the defendant. It has long been established in *Eng\*land*, and in every state in the union, where there are banks; that evidence of putting it into the mail, directed to the endorser, is sufficient. This doctrine is to be found in *Marius*, but was first particularly estab-

Feb., 1818.

Ferris
v.
Saxton.

lished in 2 *Hen. Bl.* 509, which is the leading case, and the foundation of the practice of the banks. The objection therefore to the want of notice, entirely failed upon the motion for nonsuit. The notice was sent by the mail; and there was such evidence, that the jury might fairly infer that *Saxton* received it. There was nothing in the idea that the letter should have been sent to *Hunt's;* and not to *Flemington.* The only permanent domicil proved, was at the latter place. No evidence was given, of any post-office nearer to *Bull's* island, and he appears to be merely a lodger at *Hunt's.* Besides, *Gordon* who was the second endorser, and to whom *Saxton* was responsible, lived at *Flemington;* and it is fair inference, that he would have sent the letter, or in some way communicated the notice to *Saxton.* The argument then is: that notice is a mere question of fact; that personal notice is not necessary; that notice sent by the post is sufficient; that *Flemington* might well be considered the residence; that *Gordon,* the second endorser, lived there, and had an interest in communicating the notice; and that the jury, from all these circumstances had a right to find the notice.

The *Judge* could not therefore nonsuit. He correctly stated, that reasonable notice was a question of fact, and referred it to the jury. It must always be a question of fact; it is absurd to say that it is a question of law. It changes with circumstances, and has often varied in *England.* In that country, there has of late years been a struggle to place it altogether in the power of the judges to decide it; but until the case of *Tindal* and *Brown,* 1 *D.* and *E.* 167, it was always referred to the jury; and that case has since been contested in *England.* See 6 *East,* 14. The ancient inquiry there, was; had the party received any injury? In our State it would be pregnant with the utmost evil, to require such strictness; and the current of decision in the *United States* has been in favour of the doctrine in *East.* See 1 *Cr.* 271-2. 2 *Hen. Bl.* 569.

Though it is not intended to insist, that notice is not necessary in case of accommodation paper, yet it is proper to urge that *it is a mere formality; and that in the

present instance, the defendant could have derived no benefit from it.

But it is not admitted that the notary or holder was bound to go out of *New-Brunswick*, to look for the endorsers. The note was dated at that place, and is thereby located ; and the notice need not be sent elsewhere. 1 *John* 294. 10 *John*. 493. 13 *John*. 432.

These positions prove that the nonsuit ought not to have been granted, and that the verdict was not against the evidence on this point. Whether the notes were stamped, and the judge was in an error on that point ; is a matter of no importance. They were payable at the bank, and this was sufficient to bring them within the strict custom of the bank. It is not however, intended to rely on this custom ; but upon the law of the land.

2. It was no error in the judge, not to put the cause to the jury, upon the question of notice. In overruling the motion for a nonsuit, he placed it properly before them as to this point, and left it to their decision. Besides, he was not required to charge respecting it, and he was not bound to do it voluntarily.

3. The verdict was not too high. This depends upon the filling up of the note; whether it was signed in blank, and afterwards filled with upwards of 4000 dollars, when it should have filled with 200 or 300 dollars. There is no evidence of this, but the testimony of *Holcomb ;* and that testimony is subject to insuperable objections. He was the drawer of the note, and therefore an incompetent witness. *Phil. Ev.* 46–47. He was also directly interested. If *Saxton* failed in his defence, and had a recovery against him, he could recover from *Holcomb*. The record in this suit would be competent evidence in his favour. The privity between surety and principal pervades all the proceedings, and it is not therefore *res inter alios acta*. Besides, if *Holcomb* were competent, he might have been disbelieved by the jury. His credit was assailed before them, as being a witness in his own cause, as being contradicted by *Smiley*, as being a regular merchant, yet showing no vouchers in such important transactions, and as telling a story altogether extraordinary and incredible ; and which if true instead of

being concealed for months, at the very place where some of the parties lived, and notes were negotiated; would have produced immediate complaint, and dis*turb- ance. Under such circumstances the jury might well disbelieve *Holcomb*, and find a verdict for the full amount claimed.

Mr. *Wall* in reply, confined himself to the points contested, and maintained; that a notice must not be sent to the place where it would be *most likely* to find the defendant, but to the place of his *residence*. *Residence*, is the real and only consideration, and therefore no evidence was given, from which the jury had a right to infer notice.

When the facts are ascertained, the court determines the law, and does not, nor ever did, leave the reasonableness of the notice to the jury. Where no notice is given, the jury never decide; and here there was no notice.

All the cases require the notice to be directed to the residence of the defendant; a mere putting it into the post-office is nothing. The case referred to in 1 *John.* is an exception, and is one of extraordinary diligence, and where the residence could not be found. *Gordon* was in no respect bound to give notice to *Saxton*, nor could the jury legally presume that he did it. There being therefore no ground for the jury to infer a notice, it was the duty of the court to nonsuit.

The question is not whether the party was injured by want of notice. No *English* case can be found to support such a notion, and if there is any case in this State, it must have been decided in those early agricultural times, when the endorser was considered as a security, and not since the law merchant has been applied.

In all the cases which are cited, to prove that the question of notice rests with the jury, a notice had in fact been given; and the dispute was whether it was given in time. In the present case no notice is given, and no difficulty is started as to time, 1 *Cranch*, 271–2.

There is no difference between business and accommodation notes; or if any, the notice in the latter should be most strict. 4 *Cranch*, 141.

3

The principle is incorrect, that *New-Brunswick* is to be considered as *Saxton's* residence, because the note is dated there. 5 *Bin.* 541. But if true, it would not avail the plaintiff, because no notice was given, or attempted to be given there.

It is confidently added, that if this be a question for the jury, *yet under all the circumstances of this case, the jury have unquestionably erred, and a remedy ought to be afforded.

The testimony of *Smiley* and *Holcomb*, who know the whole transaction, presents so suspicious a case, as, of itself to require a reinvestigation.

Nor is the objection, that the verdict is against the weight of evidence removed as to the amount, and *Large* says that the notes were not payable at bank.

CHIEF JUSTICE. This is an action on the case by the endorsee against the endorser, of two promissory notes, in which there was a verdict for the plaintiff for 10403 dollars 66 cents, and now it is moved to set aside this verdict, and to grant a new trial.

There were several questions raised by the council for the defendant on the trial, but they have now thought proper to waive some of these, and to place the motion for a new trial upon two reasons only, *viz.*

1. That the plaintiff failed in making out his action, because he did not prove notice to the endorser of the non-payment of the notes by *Holcomb*, the maker; and therefore ought to have been nonsuited at the trial.

2. That the verdict is contrary to the evidence.

The last of these reasons is founded principally upon the testimony of *Holcomb*, the maker of the notes. Now, with respect to this witness, it is to be observed, that he stood in such circumstances as to this controversy, as would not fail to interest his feelings in the highest degree. He had got this young man, who was his friend, to endorse for him to a great amount; he saw him now on the very verge of ruin; he, himself had failed, he could not save him; his friendship, his pride, his honour, falsely so called, were all engaged to alleviate this impending calamity. *Holcomb* too, had been a merchant,

a man of large business, for many years; he must have Feb., 1818. been accustomed to keep books, to make entries, to set down charges, to give credits, especially in large trans- Ferris<br>v.<br>Saxton. actions: and yet he comes into court to give testimony, in a matter like this, so important in its amount, so delicate in its nature, merely from memory; he produces no book, no entry, no memorandum, no receipt, no charge, no credit, nothing of that kind entitled to the least consideration. Under such circumstances, a struck jury of the most independent and respectable men *in the county *14 of *Middlesex*, most of them well acquainted with *Holcomb*, have thought proper wholly to discredit his testimony; and in doing so, can we say they have done wrong?

Moreover, upon *Holcomb* being offered as a witness, and objected to, because he was the maker of the note, the case of *Rosevelt* and *Gardner*, decided in this court in *May Term* 1811, and reported in *Penn. Rep.* 791, was cited, though the book was not produced, and relied upon as a case in point. From the manner in which that case was stated, by the council for the defendant, and from the imperfect recollection of it entertained by the court, it was thought to have decided the question in principle, and upon the authority of that case alone, the witness was admitted. But in looking into it, as it is reported in the book (which in the report of this trial, is called *Ally's* case, because one *Ally* was the witness there offered) it is not perceived that it touches this question at all. There *Gardner* had made a note in the usual form to *Ally*, and *Ally* had assigned it to *Rosevelt*, and in an action by *Rosevelt*, the endorser, against *Gardner*, the maker; *Ally* was held to be an admissible witness. But then it seems to have been so holden, not because it is a general principle that the endorser, in such case, shall always be received as a witness, but upon the special circumstances of that case only. *Ally*, was offered to prove that there was nothing due on the note when he endorsed it to *Rosevelt*, or at least, but conditionally due; and that he informed *Rosevelt*, of that circumstance at the time of the endorsement; and he was admitted as a witness to prove that fact. The reasoning of Judge *Pennington* in that case is not clearly understood; but he ex-

Feb., 1818.

Ferris
v.
Saxton.

pressly says, *that though he would not be understood to ap-prove the opinion of Lord Mansfield in the case of Walton and Shelly* (a pretty famous case upon this subject, decided in 1786, in *England*) *yet he would not overrule it, but leave it undisturbed.* That opinion of Lord *Mansfield* then, which was in accordance with the whole course of judicial proceeding before that time, being left *undisturbed;* there is nothing in this case of *Rosevelt* and *Gardner,* that goes to establish it as a general principle; that in an action by the endorsee against the maker, the endorser is an admissible witness; and if so, certainly nothing can be drawn from it to fortify the position, that in an action by the endorsee against the endorser, the maker can be admitted as such. *Then, laying this case of *Rosevelt* and *Gardner* out of the question, how does the matter stand ?

The notes in question were mere accommodation notes. They passed immediately from *Holcomb* to *Ferris,* in payment of a debt, and *Saxton* became endorser as a surety only. He gave no consideration for the notes to *Holcomb,* he received none for them from *Ferris.* Suppose then, *Ferris* to recover in this action, and to make the money of *Saxton's* property ; surely, *Saxton* will have his action against *Holcomb* for the amount so recovered and made ; and suppose again, *Ferris* to fail in this action, and *Saxton* to have a verdict in his favour, is it not equally sure that *Saxton,* having given no consideration for the notes, and being wholly exonerated from his liability on the endorsement, can never maintain an action against *Holcomb* on that account ? If this be a proper view of the case, then *Holcomb* was directly interested in the event of the suit to the whole amount of the notes. For he, who by his testimony, exonerates himself from a direct and immediate liability, is as much excluded as any other, on the score of interest.

Instead, therefore, of *Holcomb's* testimony being made the ground of a new trial, it ought to be laid wholly out of the case, because he was admitted as a witness, contrary to the general principles of law, and upon mistaken authority.

Some reliance too has been made in support of this

reason, on the evidence respecting the alteration of one of these notes after it had been endorsed, by making it payable at the bank, when at the time of the endorsement, it contained no *place* of payment. But inasmuch as there is evidence on both sides of this question, and inasmuch as *Smiley*, in whose hand-writing the note is, and who appears to have been wholly disinterested, has sworn positively against such alteration, which he could not have done without direct, positive and wilful perjury; and inasmuch as this was opposed only by the casual observation and fleeting memory of Mr. *Large;* however doubtful the character of the one, and however fair that of the other; it is not perceived that this ought to be made the ground of setting aside a verdict of a jury solemnly rendered, upon the fullest view and most deliberate consideration of the character and standing of both witnesses.

Though the power of setting aside verdicts, because they are contrary to the weight of the evidence, is clearly established in \*the law, yet that power is always to be exercised with the greatest caution. And where the objection to the verdict rests solely upon the jury's having credited one witness, and discredited another, it is not remembered that such power has been exercised at all. The credibility of witnesses is the *peculium* of the jury. Take that away and what is there left.

\*16

Before we proceed to the other reason, leave is prayed to observe, that it must be within the knowledge of every member of this bar, of the standing of twenty years and upwards, that the course of this court as to notice of non-payment in cases of this kind, was not formerly, according to the strict rules which are now adopted both in *England* and in our neighbouring States. This doctrine of notice was then put upon much broader principles, perhaps much too broad for public utility and private security, in these mercantile transactions. The idea then entertained, was, that the endorsee of a promissory note, must, at his peril, use due diligence to obtain payment from the maker, but it was not held that it was necessary, in order to maintain an action against the endorser, to give him notice in case of non-payment.

It was thought that the endorser was *prima facie*, liable, and that he could only exonerate himself by shewing, that if the money should be recovered against him, he would lose it, for want of due diligence in the endorser to get it from the maker, or for want of such notice of the non-payment as would have enabled him to recover it himself.

This idea was no doubt founded upon some of the old cases, which speak to that effect, with respect to the liability of the drawer of an inland bill of exchange, upon non-payment of the drawee; and of his being put to shew, upon the trial, that if recovery were had against him, he would lose for want of notice from the holder. *Salk.* 127, 133. *Lord Raym.* 743, 992. 6 *Mod.* 80, 81. *Bacon. Merchant L.* and many other cases there referred to.

But from the great increase of negotiable paper in later times, and especially since the 3 and 4 *Anne*, as well for the encouragement of trade and merchandise, as for the security of traders and merchants, this doctrine has been reduced to more certain and fixed principles. And it was chiefly with a view, as is manifest from the case here stated, of bringing up this subject for the *consideration of this court, that the plaintiff in this cause, was permitted to proceed in the trial, and to take this verdict.

Now, as to the first reason, viz. that the plaintiff did not prove notice to the endorser of the non payment, by the maker of these notes, and that therefore, he ought to have been nonsuited at the trial.

From the admissions which have been made by the counsel in the argument, all that need be said upon this subject, may be compressed within very narrow limits.

It is admitted, that according to the principles of the law, as settled at this day, the endorsee of a promissory note, in order to maintain an action against the endorser, must shew that he demanded the money of the maker, if to be found; on the day on which it became due; that is, on the third day of grace; or if that should fall on *Sunday*, then on the *Saturday* preceding, being the second day of grace; for in those mercantile transactions,

there are always given three days for payment, after the day mentioned in the note; which three days are called days of grace. In this case, such demand is admitted to have been made; and it is also admitted, as well as proved by the plaintiff; that the maker of the notes refused to pay.

It is admitted also, that in order to maintain such action against the endorser, the endorsee must give him notice of such demand and refusal, and that within a reasonable time.

What the reasonable time is, must always depend upon circumstances; such as place of residence, accessibility, means of conveyance, &c. But the reasonableness of notice, in point of time, does not at all come in question here; for the only notice pretended to have been given, being the putting of a letter in the post-office at *New-Brunswick*, and that in time for the next post after the demand and refusal of payment; it must be admitted, that if notice at all, it is reasonable in point of time.

The only real question then, here presents itself, to wit; whether the putting of the notice in the post-office at *New-Brunswick*, directed to the defendant at *Flemington*, was alone, such evidence of notice, as ought to have been left to the jury.

It is argued by the counsel for the plaintiff, in the affirmative, for that it might by possibility have reached the defendant, and whether it really did so or not, was a fact to be decided by the jury, under the circumstances of the case, and not by the court; *and that therefore the plaintiff could not have been nonsuited upon the trial. And from the course the argument has taken, we are, though it is thought unnecessarily, pressed into the question, *whether reasonable notice or not*, be a question of law, to be decided by the court; or a question of fact, to be decided by the jury.

And though this question has been well settled, yet perhaps it may not be improper to observe; that our statute respecting promissory notes and Inland bills of exchange, goes farther than either the statute of 9 & 10 *W.* 3. or 3 & 4 *Anne*. For as to these inland bills, it makes a protest *necessary* in all cases of non-acceptance

Feb., 1818.

Ferris
v.
Saxton.

*18

and non-payment, and places them *in all respects precisely upon the same footing as foreign bills;* and it then goes on and makes promissory notes assignable and recoverable in the same manner as inland bills of exchange. It is manifest then, that these promissory notes when assigned, as well as inland bills of exchange, are made wholly subject to the law merchant, or what is generally called the custom of merchants, and must be governed by it. Now, the law merchant is part of the common law of *England,* and as such is adopted by our constitution, as our law also ; nay indeed, it is the law of the whole mercantile world. It is to be taken notice of by the judges as such, and to be understood and declared by them in the same way as all other parts of the law are to be interpreted and declared. When it becomes a question, what the law merchant is in any particular case in forensic discussion, that question must be answered by the judges, and not by the jury, according to the old maxim, *ad questionem legis respondent Judices;* for this law merchant, cannot, no more than any other part of the common law, be proved before a jury by witnesses as a matter of fact, and so be subjected to them to determine what it is.

If the reasonableness of notice were to be left to juries, without any other rule than their own conceptions of reasonableness, their verdicts would be as various as their names. What one jury would think reasonable, another might think not so ; and all the transactions of mankind in this negotiable paper, would become a scene of uncertainty and confusion. No man would know when he was bound, and when he was not so, or when he must look after his effects in the hands of his correspondent, and when not. In short, it would derange the whole mercantile system. The *custom of merchants therefore, upon this subject, has established rules and regulations of its own, which govern the mercantile world; and which ought in good faith to be carried fairly into execution in every mercantile country. These rules and regulations are part of the law merchant, and as such, ought always to be declared by the court, and never to be submitted to the decision of the jury.

Taking the question of reasonable notice, in the aggregate, it is a mixed question.   What *is* reasonable notice, is a question of law for the judges; whether that notice has been given, is a question of fact for the jury; and as in all other cases where the law and the fact are blended together, the jury must pass upon it.   (a)

But then, the law as declared by the court is part of their evidence, and they are bound to observe it.

But in this case, there seems to be no room for the investigation; for the question is not, whether there was notice in reasonable time, but whether there was any evidence of notice at all, that ought to have been left to the jury.

The notice required by the law, is an actual and real notice, such an one as will apprise a man of his situation, of his liability, of his danger; such an one as will enable him to look after his effects, and secure his property. Every thing short of this, is a mere mockery. But inasmuch as in certain situations it would be very difficult and very expensive, if not impossible, even in cases of inland bills and promissory notes, to give direct personal notice to the party himself, or to his agent or family at his place of abode, it has been adjudged that the putting of such notice into the post-office directed to the endorser if he live in a post town, is sufficient evidence of the service; and this is the farthest that courts have gone to supply the direct proof of such personal notice.

Indeed, it would seem as if this were going a great way, unless such endorser lived within the circuit of the penny-post; for it is not the custom of men, in an agricultural state like this, to resort to the post-office every day to look for notices; nor is it known that they are under any obligation to do so. But this is by the by only. That question will be considered if necessary, in its proper place.

But without this, the present case does not come within the *rule as to putting notices into the post-office. It is far short of it. *Saxton* lived many miles distant.

*20

Notwithstanding therefore, what was said at the trial,

---

(a) *Halsey vs. Salmon, Pen. *917.*

as to the former course of the court, as to the province of the jury, and as to the custom of the bank; let the verdict be set aside, and a new trial granted.

ROSSELL J. This case depends principally upon two points. 1. Was the notice to *Saxton,* such as the law merchant requires in cases of this nature. 2. Is the question of notice, one on which the court is to decide, or is it to be determined by the jury.

It has been a long established principle, that the endorser and payee of a promissory note, or bill of exchange, each acquire certain rights on the execution, acceptance and non-payment of such instruments; and it is only by a strict conformity to those settled rules, that individuals can avail themselves of the benefits they may mutually claim, as parties to the notes or bills. In the present case, it will be sufficient to inquire, what were the rights *Saxton* was entitled to, as an endorser to two promissory notes. On the non-payment of the note, when due, by the drawer, and the protest made; the holder was bound to use due diligence, in giving notice to the endorser, for obvious and often repeated reasons. In *England,* the rules respecting notice, are strict in themselves, and as pertinaciously adhered to. In this country, from the difference of situation, in many particulars which need no elucidation, the rule of notice has differed in different states, and in the same state, at different periods of time. Since, however, banks have been multiplied, and post-offices established, in all the states, much more uniformity has prevailed, and no substantial reason can now be assigned why the rule of notice, in this country, cannot be reduced to as much certainty, as in any other.

From the investigation of authorities, and inquiry of individuals concerned in banking institutions, the rule in this state, I take to be this. When the endorser and holder of a note, live in the same town; personal notice, or one left at the dwelling of the endorser, is required. If the endorser lives at a distance, a written notice must be sent by the first post, to the nearest post-office, directed to his place of residence. This is a reasonable rule, as

favourable to the holder of the note or bill, as the rights *of the endorser, and the necessity of notice would admit of. And Chief Justice *Marshall* in 4 *Cranch*, 163, says: " In point of reason, justice, and the nature of the undertaking, there is no case in which the endorser is better entitled to demand strict notice, than in the case of an endorsement for accommodation, the maker having received the value."

2. Is the question of notice, for the decision of the court or jury. In this country, in the several states, it has been decided differently; sometimes as a mixed question of law and fact; sometimes left to the jury; and at others, settled by the court. In *England,* formerly, it was considered a question of fact, for the determination of the jury, on the particular circumstances of the case. But it was found, that this was productive of endless uncertainty and inconvenience, and the court laid it down as a principle; that the time, both for the demand and notice, was a question of law for the court. Juries struggled hard, to maintain their supposed rights, and it was not until new trials had been frequently granted, (in some cases as many as three) that the point was fully established, that what shall be a reasonable notice, is a question of law; and generally that a demand must be made, and notice given, as soon as under all the circumstances, it is possible to do so. In 4 *Dall.* 129, the Supreme court of Pennsylvania, as early as the year 1793, said, as soon as we can, consistently with the state of the country, its roads and its posts, it will be wise to adopt the *English* law on the subject, for the sake of certainty and uniformity in the administration of justice. In *Buller's N. P.* 273. " The endorsee must give a reasonable notice to the endorser, upon default of payment by the drawer ; but proof of making inquiry after defendant, who could not be found, will be sufficient to excuse the giving such notice, unless the defendant can prove that he was to be found. Here it is evident the endorser might have been found.

Without giving any opinion as to several other points raised, on the whole of this case, I am of opinion, that the defendant is entitled to a new trial, when the parties

may come better prepared, and the several matters re-
ceive a more deliberate examination.

SOUTHARD J. This cause, upon the state of the case,
assumes an extraordinary complexion. The defendant,
proved by testimo*ny apparently credible, that one of
the notes was endorsed while the sums and dates were
blank, and was filled up fraudulently with a much larger
sum than was agreed upon; that when signed it was not
drawn payable at bank, and not being stamped as was
required by law, could not be negotiated there. On the
other side, these facts, with the exception of the stamp,
were positively contradicted, by a witness apparently dis-
interested; so that perjury must have been committed,
or there must have been a most singular misunderstand-
ing by two witnesses on the one part; or by one on the
other. The credit of the one witness was seriously im-
peached, yet the verdict was founded on his oath. The
consideration of the note was contested; yet no docu-
ments or vouchers of any description were presented, in
transactions, said to amount to several thousand dollars.
These are circumstances well calculated to create a wish,
that this cause might be further investigated.

It is also a singular fact, that these notes, which are
not stamped, should have passed throughout the trial, as
stamped notes. This may have arisen from another note
which was in question between the parties, being actually
stamped, and the two being blended together, in the
haste of a trial. The fact itself, is of distinct importance;
because the court founded upon it, one of the points
taken, in overruling the motion for nonsuit, and I con-
sider what the court said upon that point, as subject to
many serious objections.

1. There was an error in fact. The notes were not
stamped. They were not, they could not be, nor could
they have been intended to be, negotiated at the bank.
They had not the legal requisites for that purpose. They
could only have been placed there for collection.

2. The bank neither was, nor could be, a party in in-
terest, in them. Any custom, however legal and oper-
ative, could not be mutually binding upon it and the

endorsers, as to the notes negotiated there. There were no facts on which any custom of the bank could arise and operate.

3. If there be a custom of the bank, different from the general principles of the law, respecting negotiable notes; that custom ought to have been proved, and a knowledge of it, brought home to the defendant. No proof of such custom or of such knowledge was given to the jury. The evidence of the mode in which the *notary transacted his protests and notices, was no evidence of a custom. He is an officer not of the bank, but of the public. He acts, not by any private or special directions of the bank, or any other body; but according to the requirements and regulations established by the law of the land, for all the citizens.

*23

4. But no such custom of the bank, on this subject, can exist. Why should it? Nothing in its character, or the nature of the instrument negotiated, would justify it. The qualities of negotiable notes are perfectly well settled. They are the same every where, and are unchanged by the hands into which they pass; and so far as any distinction on this point was set up, in favour of the bank, it seems to me, to be incorrect and illegal.

This point in the opinion of the court, presses itself the more strongly on my mind, because it must be regarded as the only charge given to the jury, on the subject of the notice to the endorser. After the cause was rested, nothing was said by the court on this part of the case; but the question of due diligence, was left on the remarks made in overruling the motion for nonsuit. Whether it was correct, to leave that question to the jury, in any shape, I do not now inquire; but if it were so, then the light in which it was presented to them ought to be free from all exception. In leaving it to them in this case, the notes were considered as stamped; as negotiable and negotiated at the bank; and the right was left upon the custom of the bank, as to these matters. In those respects, there was a misapprehension, and the jury may have been, and in all probability were misled by it. A verdict under such circumstances, ought not to stand.

Feb., 1818.   The cause ought to be sent back, to be reheard by another
jury.

Ferris
*v.*
Saxton.

But other questions have been fairly raised by this
rule, upon which the opinion of the court ought to be
pronounced. The legal liabilities of parties to promis-
sory notes, offer questions of present and increasing im-
portance; and ought to be settled, so far as the facts in
the case will authorise. They are a species of paper not
much known and used, in our State, under the strict
principles applicable to them, until long after they had
become the subject of statute and adjudication in *Eng-
land*. The nature of our situation and society, and the
habits of business and of intercourse among our citizens,
did not early call for the inflexible application of com-
mercial rules, even to commercial paper; and the courts
yielded, in some measure, to the prevailing habits of *the
people. Hence it was not until a few years back that we
find any settled decisions, conforming to the rigid rules
of the law merchant. Such has lately, however become
our situation: lying between two of the most commer-
cial cities in the union; the number of our banks exces-
sive, in proportion to the wealth and population of the
State; notes of this description daily increasing to an
enormous extent, and until they have become the most
common evidences of debt; that it is necessary with le-
gal strictness, to judge of them according to their nature;
and to apply the rules which we find established respect-
ing them. Nor can such application produce any hard-
ship. If the parties are not mercantile men, it is easy.
and they ought to use other evidences of debt. If they
are mercantile men, and the transactions are commercial;
they will not only be willing, but they ought to submit
to the rules of mercantile law, where the utmost punctu-
ality is demanded. The ever changing state of debts,
credits, and effects, in the hands of such men, requires
the most prompt information, to him whose interest is
concerned, or whose credit is pledged; and the most rigid
application of the remedies, which the law has provided
in his favour.

The facts in this case, bring into consideration the re-
spective obligations of the holder and endorser; and it

becomes important to inquire, what is the engagement
which the endorser makes, to pay the money? and what
the holder must do, to fasten the payment upon him?
I do not understand the engagement to be what it was stated
at the circuit, to have heretofore been considered, that of
a security; "who must shew that the non-payment
had been owing to want of due diligence in the holder,
and that if condemned, the loss would fall upon him,
for want of reasonable notice of such non-payment."
The character of his engagement, is very marked; and
altogether different from this, both in the matter itself,
and the party on whom the proof lies.

The endorser binds himself to pay on two conditions.
1. That the maker, when a demand is made upon him,
or due diligence used to make the demand, shall neglect
to refuse to pay.  2. That the holder of the note, shall
use due diligence to give him notice of this default, and
of his consequent liability.  On the failure of *either* of
these terms, he is not bound to pay.  If the plaintiff *do
not prove both*, he ought not to be permitted to recover.

Upon the first of these conditions, it will here be suf-
ficient to *remark; that the demand must be according      *25
to the terms of the note, either personal, at his house, or
at the place appointed for payment: (2 *H. B.* 509) but
that nothing will excuse *it*; or due diligence to make it.
Even where the note was endorsed several years after its
date and day of payment, still it was correctly adjudged
to be necessary.  9 *John.* 121.  The reason is plain.  This
demand is part of the contract entered into by the en-
dorser, and must be performed before his liability com-
mences.  In this case, the demand was made at the prop-
er time, and in the proper place.

Upon the second condition of the endorser's undertak-
ing, I remark: that it is an essential part of his contract,
and designed for his benefit, as it is presumed, that many
means of obtaining payment, through the assistance of
friends and otherwise, may remain to him; and the law
attaches so great importance to it, that neither death,
bankruptcy, insolvency, or imprisonment of the maker,
will excuse the omission of it.  Being designed too, for
information of the default, it must not be given before

that default actually exists; otherwise it will be considered as no notice. 12 *John.* 424. 2 *Caines,* 343. *Bl. Rep.* 747, 1 *T. R.* 167.

The point on which most difficulty has arisen, and which has most strongly divided courts and counsel, is the time, within which the notice must be given, after the default, in order that the endorsee may not be considered as failing in due diligence. But though I think the question susceptible of a clear determination, and though it was much discussed at the bar, I do not think the facts of the case, either require or permit its investigation; and shall therefore express no opinion upon it, further than to say, that the notice was put up by the notary, into the office, at the time required by law.

If the relative situation of the parties is such, that the notice which the law has rendered so absolutely necessary, cannot be served personally on the endorser; in that case, the law points out, what is equivalent to a personal service of the notice. It requires, that it be sent by the mail, to the post-office nearest the residence of the endorser. 2 *H. B.* 509. It *presumes*, from the certainty of the letter carriage in the mail, that a notice so sent, will be safely carried and received; as the endorser in the regular course of his business and correspondence, will call for letters at that office. But it must be to the nearest post-office only; be*cause that alone ensures this certainty. If it might be sent to any other, then the endorsee might select which, and though he might send it, to any one of twenty, in the part of the country where the endorser lived, he would never receive it. Nor will this requirement be satisfied, by sending it where the endorser would be considered the *most likely to receive it.* No discretion is left to the endorsee. The law fixes what is to be regarded as the most likely place; and it is reasonable that it should do so. The notice is an essential thing, the law ought to secure its reception; and if any thing be permitted to supply the place of personal service, it should be something fixed, determinate, certain; depending upon no contingencies; subjected to no discretion; controlled by no calculations, which may result from error, mistake, or even fraud. An endorser's rights

do not depend upon the accuracy of a guess. The law permits one thing, and one only, to stand in the place of personal service; and that is, a sending to the post-office nearest to his residence. 13 *John.* 432. Whether even this notice, will be declared sufficient, in our agricultural State, in cases where the endorser resides at a distance from the post-office, may well be questioned ; but certainly nothing short of it will answer.

In determining what the residence is, we are not, as was argued, to be governed by the place where the note was dated. That is, neither in fact nor law, the place of residence. No argument which suggests itself to my mind, would render such a position reasonable, and I can find nothing in the books to justify it. 5 *Bin.* 541. In *Chapman* v. *Lipscombe* (1 *John.* 294) the decision did not turn on the fact, that the note was dated at *Norfolk,* whither the notice was sent. Unusual diligence was used, and the residence could not be discovered ; but the person giving the notice, being informed that it prob-ably was *Norfolk,* one notice was sent there, and another put into the office at *New-York,* which was the *place,* where the note was *both dated and negotiated.* The real abiding place or home of the endorser, at the time, if it can be found, must be directed to ; no matter what may be the character of that home or residence; which will no doubt, vary with that of the man himself. With a married man, it will be of one kind ; with a single man, having no family, it will be of another, being merely his boarding-house. But the residence of the last is as im-portant to the party, and in the eye of the law, *as the first. *27 It must be sought with the same diligence, it must be di-rected to, with the same precision. Nor is there any hardship in this. The endorsee knows, or ought to know, his endorser, before he takes the note; especially if he relies on his responsibility : and if he chooses to take his engagement, he must do it, under the universal legal lia-bilities. The case in 13 *John.* 432, *Bank of Utica* v. *Demott,* is correctly decided, according to my understanding of the law, and shews the necessity of diligence, in find-ing the residence, and that notice sent to a wrong place, will not avail. *Demott* resided in *Ovid;* inquiry was

4

Feb., 1818.   made of the cashier and directors of the bank, who were
likely to know his residence; and the information was,
that he resided in *Canandaigua;* a cancelled note, in the
hand-writing of a person living in *Canandaigua,* drawn
by the same person with the one in dispute, and en-
dorsed by *Demott,* was also found; and the notice was
consequently sent to that place. This was declared not
sufficient. The real residence might, and should have
been found; and a notice thus sent, could not be regarded
as a compliance with the law.

Ferris
*v.*
Saxton.

We may then lay it down, as a position incapable of
being questioned; that in order to render the endorser
liable, he must receive, either a real personal service of
the notice, or what the law has rendered equivalent, a
notice must be sent to the post-office nearest to his actual
residence. Until this be done, the endorsee has no possi-
ble claim against him; and until he proves it, he cannot
call upon the endorser to make defence. The contract is
a specific one, the proof of every thing necessary to com-
plete his right, must be strict. The defendant cannot be
called to shew the negative of any one part of it.

When we apply these principles to this case, I appre-
hend the rights of the parties will be readily understood.
When the motion for a nonsuit was made, the following
facts may be considered as proved. 1. That a regular
and legal demand, according to the tenor of the note,
had been made; that there was a refusal of payment
and a protest. 2. That on the following day, a letter
containing a notice of this demand, refusal and protest,
was put by the notary, into the post-office, addressed to
the defendant, at *Flemington.* That it was sent to that
place, because the notary was informed by one *Samuel
Holcombe* of *New-Brunswick,* a *merchant whom he under-
stood, came from the part of the country, where *Saxton*
lived, and had connexions in trade there, that *Flemington*
was the most likely place of his receiving a notice; and
another letter, in all respects similar, was sent to the
same place, to *Thomas Gordon* another endorser. But no
other proof of residence, or actual notice was given.

*28

From this statement, it cannot but be manifest, that no
actual personal notice was given, nor was there any one

fact, from which a jury could fairly and legally infer it.
It was however, strenuously insisted by the counsel of
the plaintiff, that this evidence ought to have been left
to the jury, as *some proof* of actual notice; because the
place was a likely one for him to receive it; and *Gordon*
the other endorser lived there, and it was probable that
he would communicate the notice. Whatever may be
said of the ability displayed in the argument; the con-
clusion appears to my mind, to be erroneous. Several
answers present themselves.

1. The notice is of the essence of the contract. It cre-
ates the liability to pay. It ought not to rest upon pre-
sumption and inference. Legal and sufficient evidence
of its existence ought to be given, or the court should
not permit the jury to guess and presume away a party's
rights. In this, as in ejectment and other cases, if the
court be satisfied that the facts constituting the right of
recovery, be not in some shape proven, it will not risk
the probability that the jury will depart from the law in
its verdict, but will direct the plaintiff to be called.

2. There was no proof before the jury, that *Gordon* the
other endorser, lived at *Flemington;* or that *Gordon* ever
received any notice.

3. Such proof, if given, would not have affected the
cause. The responsibilities and rights of the endorsers,
are separate and distinct. A notice to one, will not au-
thorise a legal presumption of notice to another, because
he is, in no respect bound to give it.

4. If *Gordon* had given notice to *Saxton*, it could have
availed the plaintiff nothing. To fix the liability of the
endorser, the notice must be from the very party in in-
terest, from the endorsee himself. The nature and char-
acter of the notice is distinctly marked. It must be
given by the holder, or a person authorised by him. In-
formation from a third person, even though he should
*be an endorser, or the maker himself, will be altogether      *29
insufficient. It is in fact, no notice. It could not legally
be proved, or if proved, it could not avail. *Kyd* 80.

5. No legal presumption can arise from the evidence,
that defendant was likely to receive a notice at *Fleming-*

Feb., 1818.  *ton.* The law knows but one such likely place, and that
is the nearest post-office.

Ferris
v.
Saxton.

No proposition can therefore be more manifest to my
mind, than that the plaintiff did not make out such a
case, as would in law, justify a recovery; and that he
ought therefore to have been subjected to a nonsuit.

I do not think it necessary here, to go into an investi-
gation of the question, which tribunal has jurisdiction
over the reasonableness of the notice. The facts do not
fairly raise the question; nor could it profit the plaintiff,
were we to determine, that it was a question altogether
for the jury. He has no rights, unless he prove that a
legal notice was given. If he fail in this, both court and
jury are required by law to decide against him. But
should the case be submitted to the jury, and they still
find in his favour, the court would be compelled to set
aside their verdict. It will never silently see a verdict re-
corded, which is manifestly against law, and the rights of
the parties. The court ought, as far as possible, to avoid
such a result, by charging the jury with great explicit-
ness, as to the law arising upon the facts.

In forming the conclusion, to which I have arrived, I
have paid no attention to what was urged, respecting the
verdict being against the evidence, which related to the
consideration and filling up of the notes. That part of
the case, certainly does exhibit an aspect, which induces
a strong desire to see it further investigated; but per-
haps would not, of itself, absolutely call for a new trial.
I doubt the propriety of admitting *George Holcomb* as a
witness, and it seems to be proper that the jury should
judge without control of the credibility of *Smiley*, as well
as *Holcomb* and *Large*. I confess however, that the judg-
ment which they did form about it, seems strange and
extraordinary.

Upon the whole, from the best examination which I
have been able to give the subject, I am of opinion. 1.
That the court erred, in what was said respecting the cus-
tom of the bank. 2. That the plaintiff had not proved

*30   sufficient to authorise the case to go *to the jury. 3.
That the verdict, being manifestly against the legal lia-
bilities of the endorser, ought to be set aside.

By the *Court.* Let the verdict be set aside, and a new <span>Feb., 1818.</span>
trial granted.